UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

UNITED STATES OF AMERICA,

Plaintiff,

v.

VIRAB TOROSYAN,

Defendant.

Case No. 2:16-cr-00063-APG-PAL

**REPORT OF FINDINGS AND
RECOMMENDATION**

(Mot Suppress – ECF No. 60)

Before the court is Plaintiff Virab Torosyan's ("Torosyan") Motion to Suppress Evidence (ECF No. 60) which requests an evidentiary hearing, and was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and LR IB 1-4 of the Local Rules of Practice. The court has considered the motion, the government's Response (ECF No. 63), Torosyan's Reply (ECF No. 64), and the arguments of counsel at a hearing conducted June 20, 2017.

## BACKGROUND

Torosyan was initially charged in a criminal Complaint (ECF No. 1), and was subsequently Indicted (ECF No. 3) and charged with one count of conspiracy to commit bank fraud in violation of 18 U.S.C. §§ 1344, 1349, one count of trafficking in, production of, and use of counterfeit access devices in violation of 18 U.S.C. § 1029, one count of aggravated identity theft in violation of 18 U.S.C. § 1028A, and aiding and abetting in violation of 18 U.S.C. § 2. The charges arise out of an investigation conducted by the officers of the Las Vegas Metropolitan Police Department ("LVMPD") and United States Secret Service ("USSS") agents between February and June 2014.

In June and July 2014, LVMPD Detective Jogodka applied for and obtained four separate state search warrants for Torosyan's residence, 3 vehicles. Torosyan's DNA and digitally stored evidence on devices seized during execution of the search warrants for the residence and vehicles. Torosyan was present on July 1, 2016 during execution of the search warrant on his Lemon Valley

1

residence.  According to discovery produced to the defendant in this case, after Torosyan received and waived *Miranda* warnings, he made incriminating statements.  Torosyan seeks to suppress evidence recovered from the residence, vehicles, his DNA and his statements.

## I.     The Parties' Positions

### A.  Motion to Suppress

In the current motion. Torosyan seeks to suppress evidence obtained pursuant to all four search warrants for: (1) his Lemon Valley home, and two trucks, a Ford F350, and Dodge Ram; (2) Torosyan's DNA; (3) a Toyota Camry; and (4) the content of electronic storage devices recovered from the residence and vehicles.  Torosyan argues that all of the warrants are invalid. With respect to the Lemon Valley/vehicle warrant, Torosyan argues the warrant was overbroad and that the four corners of the supporting affidavit do not establish probable cause for the items to be searched for and seized.  Without the tainted evidence recovered from execution of the first warrant, the DNA warrant affidavit failed to establish probable cause for collection of Torosyan's DNA.  He contends the Camry warrant was overbroad, and that the supporting affidavit appears to contain material misrepresentations that require an evidentiary hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978).

Additionally, Torosyan argues the fourth search warrant to search the electronic devices seized during the execution of other warrants was an unreasonable seizure because police waited for 29 days to obtain a warrant to search the electronic devices recovered from execution of the other warrants.  Citing *United States v. Mitchell*, 565 F.3d 1347, 1353 (11th Cir. 2009), Torosyan argues that the Fourth Amendment requirement for prompt search warrants applies with even greater force to computers which contain the digital equivalent of its owner's home and are capable of holding a universe of private information.  The items were seized during the raid on July 1, 2014, and the warrant to search the contents was not applied for until July 30, 2014.  According to discovery provided to the defense the search of the electronic devices was not completed for more than a year. There is no discernable excuse for the lengthy delay and the court should therefore suppress evidence recovered from the search of the electronic and digital devices.

Finally, Torosyan seeks to suppress statements he gave to the police arguing they were taken in violation of his *Miranda* rights and involuntary under the totality of the circumstances. The discovery provides no reliable record that *Miranda* warnings were given. Police interrogated Mr. Torosyan at least twice, first at the house after the search warrant was executed, and then in the patrol car on the way to jail. Torosyan suggests police obtained his statements in a deliberate two-step interrogation strategy. Even if police gave proper *Miranda* warnings to Torosyan at his residence before taking the first statements, new *Miranda* warnings were required under the circumstances. Torosyan argues that his will was overborne by the pressure placed on him by the SWAT team who raided his home in the early morning and handcuffed him and his daughter during execution of the search warrant. Mr. Torosyan does not understand English and "was left to fear the worst."

**B. The Government's Opposition**

The government opposes the motion and request for an evidentiary hearing arguing that the motion to suppress raises questions of law and there are no material facts reasonably in dispute. The opposition traces the course of the investigation and information learned by investigating officers and asserts that all four search warrants were supported by probable cause. The government disputes that the search warrant for the Lemon Valley home and vehicles was overbroad. The search warrant was appropriately limited to searching for evidence of a particular crime and sufficiently specific given the nature of the suspected crimes. The search warrant was therefore reasonable under the circumstances. The issuing judge had a substantial basis for concluding that probable cause to search the residence and the vehicles existed under the totality of the circumstances, and the issuing judge was justified in relying on detective Jogodka's training and experiencing in reaching the probable cause determination.

The government's written response maintains that Torosyan received and waived *Miranda* warnings. During execution of the search warrant, Torosyan was handcuffed and put on the couch for officer safety and later placed under arrest after the SWAT team cleared the residence. Torosyan voluntarily spoke with officers and there is no evidence that the officers used coercive

1    or aggressive tactics to persuade him to make any statements.  Applying the *Schneckloth v.*

2    *Bustamonte* factors, the court should find Torosyan's statements voluntary.

3        The government also contends there was probable cause to seize Torosyan's DNA based

4    on the skimmers and guns seized during execution of the warrant in the Lemon Valley home.  The

5    government argues that the warrant for the Camry was sufficiently particular and not overbroad.

6    The government disputes that the affidavit for the warrant contained any material omissions and

7    argues Torosyan has not met his burden of making a substantial threshold showing of a deliberate

8    falsehood or reckless disregard for the truth in the application supporting the Camry warrant to

9    entitle him to a *Franks* hearing.

10        Finally, the government disputes that the search warrant for the electronic storage devices

11    was overbroad.  The government contends that it did not cause any unreasonable delay in seeking

12    a warrant to search the electronic storage devices recovered in other warrants.  The court should

13    determine whether a delay is unreasonable under the totality of the circumstances and on a case-

14    by-case basis.  In deciding whether a delay in obtaining a search warrant is reasonable, courts

15    balance the nature and quality of the intrusion on the defendant's Fourth Amendment rights against

16    the importance of the government interest alleged to justify the intrusion.  The government argues

17    that electronic data searches may take longer than traditional searches because they involve

18    intermingled data which make responsive materials more difficult to retrieve without close

19    analysis and a closed environment.  Based on the amount of evidence collected "and the detail of

20    the Torosyan's operation" officials exercised proper restraint in insuring the warrant sought for

21    electronic storage devices "was adequately prepared so as to not interfere with the privacy interests

22    of the defendant."  Therefore, the 29-day delay between seizure of the devices and the application

23    to search the electronically stored information on the devices was not unreasonable.

24        **C.  Reply**

25        Torosyan replies that an evidentiary hearing is required on two issues.  First, a hearing is

26    needed to address the parties' factual disputes concerning the circumstances underlying Mr.

27    Torosyan's statements to the police on July 1, 2014.  The court is required to conduct an

28    evidentiary hearing when the moving papers filed in connection with the pretrial suppression

motion show there are contested issues of fact relating to the lawfulness of a search or a confession. The decision about whether a statement is voluntary is a highly fact-specific inquiry requiring a hearing. Torosyan agrees that an evidentiary hearing may be limited to addressing whether his July 1, 2014 statements to police are admissible, and whether police obtained a search warrant for the Toyota Camry through a deliberate or reckless omission in the search warrant affidavit.

The reply reiterates arguments that the search warrant for the Lemon Valley residence and vehicles was overbroad and fails to establish probable cause. The warrant was overbroad because it did not describe the items to be seized with sufficient particularity. The warrant authorized seizure of ten categories of information, but the affidavit supporting the affidavit does not provide probable cause to believe that all ten broad categories was reasonable. The government's opposition failed to respond to the substance of Torosyan's arguments applying the *Spilotro* and *Cardwell* decisions, and should therefore be interpreted as a concession of the merits of that argument.

With respect to Torosyan's statements, the government does not dispute that *Miranda* warnings were required as Torosyan was in custody and subjected to custodial interrogation. A hearing is necessary to establish what warnings, if any, were given, whether police obtained a valid waiver as a matter of law, and whether police did or should have re-*Mirandized* Mr. Torosyan, before the second interrogation. An evidentiary hearing is required to determine whether police engaged in a deliberate two-step interrogation.

Toroysan argues the search warrant for the Toyota Camry was invalid because Detective Jogodka omitted information in the warrant affidavit, and because the warrant itself is overbroad. The government acknowledges that the California informant referred to in the search warrant application was Edmond Eskandari who was involved in the underlying police investigation. However, Detective Jogodka failed to inform the issuing judge of the source of the information or Eskandari's criminal history, which includes identity theft and making a false financial statement. The government also does not dispute that Eskandari's information to police was the sole basis for seeking the Camry warrant even though police in California had searched the car the prior day and found no evidence of crimes. Detective Jogodka failed to provide critical information bearing on

the informant's reliability to the issuing judge to decide whether the information was credible and reliable.  Eskandari's involvement in the investigation, criminal history, and motive to fabricate facts when he was arrested would have influenced the issuing judge's decision about whether probable cause existed. A *Franks* hearing is therefore warranted because Torosyan has shown by a preponderance of the evidence that Detective Jogodka deliberately or recklessly included misstatements or omissions in the warrant supporting the affidavits, and that a redacted or supplemental affidavit would not support a probable cause determination.

Additionally, the government's response acknowledges that the Camry warrant was broad. To satisfy the Fourth Amendment, a warrant must describe the place to be searched, or things to be seized with sufficient particularity, taking account of the circumstances of the case and the types of items it involves.  The warrant must also be no broader than the probable cause on which it is based.  The government does not dispute that if the Lemon Valley warrant is invalid, that evidence derived from it cannot serve as the basis for the Camry warrant.

Finally, the reply reiterates arguments that the 29-day delay in obtaining the search warrant to search the electronic storage devices is unreasonable and violated Torosyan's Fourth Amendment Rights.  The government waited 14 days to ship the materials to a forensic laboratory in California on July 30, 2014, and received the items back 460 days later on September 9, 2015. Detective Jogodka wrote a report 42 days later on October 21, 2015, stating only that "notable items of evidence recovered on one device."  His report does not indicate any other devices contained evidence of the crimes, but the government continued to seize the 28 other items including laptops, digital camcorders, a digital camera, two iPhones, five cellular flip phones, a portable GPS, and several USB portable thumb drives.  These items remain seized although they apparently lacked any evidentiary value.  This seizure constitutes a significant and protracted intrusion on Mr. Torosyan's privacy and personal interests.  The government's year-long delay in reviewing the material to see if it even contained evidence justifying its seizure was unreasonable. There is no discernable excuse for the lengthy delay and all items on the electronic storage devices search warrant should therefore be suppressed.

**DISCUSSION**

As an initial matter, an evidentiary hearing in this case was initially set for April 14, 2017 (ECF No. 65). The hearing was continued several times pursuant to the stipulations of counsel, and on one occasion because Torosyan suffered a medical emergency. The hearing was finally held on June 20, 2017. At the beginning of the hearing, government counsel, AUSA Kilby McFadden, announced that the government did not intend to introduce Torosyan's statements in its case in chief. The court inquired of defense counsel whether, if the government was precluded from introducing any evidence of Torosyan's statements during its case in chief, there was any need for an evidentiary hearing. Counsel for Torosyan initially took the position that an evidentiary hearing was required because involuntary statements are not admissible even for impeachment. The court pointed out that the court would not need to decide whether the statements were voluntary unless Toroysan elected to testify at trial and testified in a manner inconsistent with his statements to police. The court took a 10-minute recess to allow defense counsel to consider and discuss the matter among themselves and with their client. After resuming the hearing, defense counsel agreed that an evidentiary hearing with respect to defendant's statements was not necessary if the government was precluded from admitting his statements in its case in chief.

The court will therefore recommend that the motion to suppress statements be denied as moot but preclude the government from using Torosyan's statements in its case in chief, reserving any issue with respect to whether or not the government may use statements for impeachment for the trial judge's determination in the event Torosyan elects to testify at trial and testifies inconsistently with his July 1, 2014 statements.

Turning to the issues that remain, Torosyan argues the search warrant for his residence and two trucks was not supported by probable cause and overbroad. He also argues that the search warrant for his DNA lacked probable cause without tainted evidence recovered from the residence and vehicles. He contends that the search warrant for the Camry lacked probable cause, was overbroad, and that the issuing judge was misled by false or recklessly misleading omissions about the source of the information used to support probable cause, and the reliability and criminal

1  history of the source.  Finally, Torosyan argues the warrant to search the electronic devices was

2  overbroad, and law enforcement violated his Fourth Amendment rights by unreasonably delaying

3  obtaining the warrant to search the contents, and taking an unreasonable amount of time to search

4  the devices.

5  **I.    Legal Standards**

6  The Fourth Amendment secures "the right of the people to be secure in their persons,

7  houses, papers, and effects against unreasonable searches and seizures." U.S. Const. amend. IV.

8  The Fourth Amendment protects reasonable and legitimate expectations of privacy. *Katz v. United*

9  *States*, 389 U.S. 347, 350–51 (1967).  The Fourth Amendment protects "people, not places." *Id.*

10  at 351.  Evidence obtained in violation of the Fourth Amendment, and evidence derived from it

11  may be suppressed as the "fruit of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471,

12  484–87 (1963); *United States v. Lundin*, 817 F.3d 1151, 1157 (9th Cir. 2016); *United States v.*

13  *McClendon*, 713 F.3d 1211, 1215 (9th Cir. 2013) ("Searches and seizures that offend the Fourth

14  Amendment are unlawful and evidence obtained as a direct or indirect result of such invasions is

15  considered 'fruit of the poisonous tree' and is inadmissible under the exclusionary rule.") (citing

16  *Wong Sun*, 371 U.S. at 484–87).

17  **A.  Probable Cause to Support a Search Warrant**

18  The warrant clause of the Fourth Amendment requires that a warrant particularly describe

19  both the place to be searched and the person or things to be seized.  U.S. Const. amend. IV;

20  *Maryland v. Garrison*, 480 U.S. 79, 84 (1987); *United States v. Fries*, 781 F.3d 1137, 1151 (9th

21  Cir. 2015).  Thus, a magistrate judge "may authorize a search of a location only if officers establish

22  probable cause to believe evidence of a crime may be found there." *United States v. Hill*, 459 F.3d

23  966, 970 (9th Cir. 2006).  Probable cause requires only a fair probability or substantial chance of

24  criminal activity.  *United States v. Alaimalo*, 313 F.3d 1188, 1193 (9th Cir. 2002).  Neither

25  certainty nor a preponderance of the evidence is required. *United States v. Kelley*, 482 F.3d 1047,

26  1050 (9th Cir. 2007).

27  In *Illinois v. Gates*, 462 U.S. 213 (1983), the Supreme Court established the standard of

28  review for the issuance of a search warrant.  The Court found that the issuing magistrate judge

must make a "practical, common-sense decision whether, given the totality of the circumstances set forth in the affidavit, including the veracity and basis of knowledge of people supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id*. at 238–39. A reviewing court has a duty to ensure that the magistrate judge had a "substantial basis" for concluding that probable cause existed. *Ewing v. City of Stockton*, 588 F.3d 1218, 1223 (9th Cir. 2009) (citing *Gates*, 462 U.S. at 238–39). The probable cause standard is a fluid and nontechnical concept that is incapable of precise definition or quantification. *See Maryland v. Pringle*, 540 U.S. 366, 370–71 (2003); *Hill*, 459 F.3d at 972 (noting that probable cause is "not readily susceptible to multifactor tests or rebuttable presumptions"). In doubtful cases, the court should give preference to the validity of the warrant. *Kelley*, 482 F.3d at 1050–51 (citing *Gates*, 462 U.S. at 237 n.10). The court should not "flyspeck" the affidavit supporting a search warrant through de novo review; instead, the magistrate's determination "should be paid great deference. *Id*. at 1051 (citing *United States v. Gourde*, 440 F.3d 1065, 1069 (9th Cir. 2006) (en banc)). Therefore, a judge's determination that an affidavit provided probable cause to issue a search warrant "will be upheld unless clearly erroneous." *United States v. Alvarez*, 358 F.3d 1194, 1203 (9th Cir. 2004).

**B. Particularity and Breadth of Warrant**

Search warrants must be specific. *Hill*, 459 F.3d at 973. "Specificity has two aspects: particularity and breadth. Particularity is the requirement that the warrant must clearly state what is sought. Breadth deals with the requirement that the scope of the warrant be limited by the probable cause on which the warrant is based." *Id.* (citing *United States v. Towne*, 997 F.2d 537, 544 (9th Cir. 1993)).

To satisfy the particularity requirement the "description must be specific enough to enable the person conducting the search reasonably to identify the things authorized to be seized." *Fries*, 781 F.3d at 1151 (quoting *United States v. Smith*, 424 F.3d 992, 1004 (9th Cir. 2005)). In determining whether a warrant is sufficiently particular, the Ninth Circuit considers one or more of the following factors: (1) whether probable cause exists to seize all items of a particular type described in the warrant; (2) whether the warrant sets out objective standards by which the

1   executing officers can differentiate items subject to seizure from those which are not; and (3)

2   whether the government was able to describe the items more particularly in light of the information

3   available to it at the time the warrant was issued.  *See, e.g.*, *United States v. Turner*, 770 F.2d 1508,

4   1510 (9th Cir. 1985).

5          The warrant's description of items need only be "reasonably specific, rather than

6   elaborately detailed."  *Hill*, 459 F.3d at 973 (citing *United States v. Storage Spaces Designated*

7   *Nos. 8 & 49*, 777 F.2d 1363, 1368 (9th Cir. 1985)) (internal citation omitted)).  "Warrants which

8   describe generic categories of items are not necessarily invalid if a more precise description of the

9   items subject to seizure is not possible."  *Id*.  The level of specificity required "varies depending

10  on the circumstances of the case and the type of items involved."  *Id.*; *see also United States v.*

11  *Spilotro*, 800 F.2d 959, 963 (9th Cir. 1986) (the level of detail necessary in a warrant is related to

12  the particular circumstances and the nature of the evidence sought).  "[T]he scope of a lawful

13  search is 'defined by the object of the search'."  *United States v. Ewain*, 88 F.3d 689, 692 (9th Cir.

14  1996) (quoting *Garrison*, 480 U.S. at 84).  The test is an objective one: "would a reasonable officer

15  have interpreted the warrant to permit the search at issue."  *United States v. Gorman*, 104 F.3d

16  272, 274 (9th Cir. 1996); *see also United States v. Leon*, 468 U.S. 897, 918–19 (1984); *United*

17  *States v. Traylor*, 656 F.2d 1326, 1331 (9th Cir. 1981).

18         The purpose of the particularity requirement is to prevent general searches.  *Garrison*, 480

19  U.S. at 84.  By limiting the authorization to search the specific areas and things for which there is

20  probable cause to search, the particularity requirement ensures that the search will be carefully

21  tailored to its justifications, and will not become a wide-ranging, exploratory search that the Fourth

22  Amendment prohibits.  *Id.*  The need to prevent general exploratory rummaging of a person's

23  belongings is particularly acute in document searches because, unlike requests for other tangibles,

24  document searches tend to involve broad disclosures of the intimacies of private lives, thoughts,

25  and transactions.  *United States v. Washington*, 797 F.2d 1461, 1468 (9th Cir. 1986) (citation

26  omitted).  However, the Ninth Circuit has often recognized a legitimate law enforcement need to

27  scoop up large quantities of data and sift through it carefully for concealed or disguised pieces of

28  evidence.  *See*, *e.g.*, *Hill*, 459 F.3d at 973.

"The purpose of the breadth requirement is to limit the scope of the warrant by the probable cause on which the warrant is based." *Fries*, 781 F.3d at 1151 (quoting *Smith*, 424 F.3d at 1004); *see also Hill*, 459 F.3d at 973 ("'Breadth deals with the requirement that the scope of the warrant be limited by the probable cause on which the warrant is based'.") (quoting *Towne*, 997 F.2d at 544). Stated differently, "overbreadth is a tailoring question: does the proposed warrant limit the government's search to the specific places that must be inspected to confirm or dispel the suspicion that gave rise to probable cause?" *In re Search of Google Email Accounts*, 92 F. Supp. 3d at 950 (citing *Garrison*, 480 U.S. at 84 ("By limiting the authorization to search to the *specific areas* and things for which there is probable cause to search, the requirement ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wire-ranging exploratory searches the Framers intended to prohibit.") (emphasis added)). *See also United States v. Cardwell*, 680 F.2d 75, 78 (9th Cir. 1982); Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 3.7(d) at 546 (5th ed. 2012) (describing overbreadth as the "object-place nexus" issue, and noting that the problem arises when a search warrant describes "the place be searched in broader terms than is justified by the probable cause showing in the affidavit.").

The court will apply these standards to each of the search warrants challenged in Torosyan's motion in the order in which the warrants were obtained.

### 1. Lemon Valley/Ford 350/Dodge Ram 3500 Search Warrant

Detective Jogodka applied for a search warrant for Torosyan's Lemon Valley residence, a Ford 350 truck, and Dodge Ram 3500 truck on June 25, 2014. The affidavit supporting the search warrant outlines the investigation leading up to the request for the warrant beginning on or about February 3, 2014, through the date of the warrant. The supporting affidavit is a lengthy 23-page, 42-paragraph summary of the nature of the investigation in which Torosyan was the primary suspect. The affidavit relates that the investigation involved individuals using fraudulently obtained account information to manufacture forged or counterfeit credit cards and debit cards used to purchase fuel, and then resell the fuel at a discount. Detective Jogodka related that beginning on February 3, 2014, an investigation was initiated for suspected crimes related to possession of credit cards/debit cards without owner's consent and fraudulent use of credit/debit

11

1    cards.  He had information from prior investigations reporting the Dodge Ram 3500 truck was

2    involved in this fraudulent scheme.  Application and Affidavit for Search Warrant, Exhibit A to

3    Defendant's Motion to Suppress p. 4 ¶ 1.  Surveillance was initiated on the Dodge Ram to

4    determine if it was being used to commit any criminal activities.  *Id.*  A record check revealed the

5    Ram was recently registered on January 31, 2014, in the name of Gegam Torosyan.  *Id.* ¶ 2.  On

6    February 10, 2014, surveillance was initiated on a blue Ford 350 pickup truck which was observed

7    as it drove from the back parking lot of an automotive repair business where Detective Jogodka

8    was conducting surveillance.  *Id.* ¶ 3.

9        The search warrant affidavit sets forth in great detail the surveillance conducted over a 4-

10   month period.  It also outlines various investigative methods used to determine whether the

11   individuals associated with the two vehicles were engaged in any suspected criminal activity.  The

12   affidavit details, in chronological order, the officers' surveillance and investigation which revealed

13   that Torosyan was the primary driver of the Ford 350, and Edmond Eskandari was the primary

14   driver of the Dodge Ram 3500.  Law enforcement officers observed that both vehicles were

15   equipped with special tanks and other equipment capable of storing, transporting, and pumping

16   large amounts of fuel.  Both Torosyan and Eskandari were observed driving to multiple gas stations

17   throughout Clark County, Nevada, inserting credit cards or debit cards at gas stations into the bank

18   card acceptor on fuel pumps, and obtaining large amounts of fuel.

19       Investigators observed Torosyan and Eskandari making multiple gas purchases multiple

20   times a day.  Investigators observed that Torosyan and Eskandari would sometime swipe the cards

21   multiple times at the same station at the same time as if initiating multiple purchases.  After making

22   these observations, investigators would contact management of the gas stations to determine

23   whether fuel purchases had actually been made, the amounts of the transactions, and the accounts

24   on which the purchases were made.  Investigators then followed up with the banks issuing the

25   credit and debit cards to confirm whether the purchases were valid or fraudulent.  Investigators

26   confirmed that the credit and debit cards Torosyan and Eskandari were observed using were

27   forged, counterfeit, or otherwise unauthorized, *i.e.*, fraudulent.

28

12

Torosyan and Eskandari were also observed by surveilling officers meeting with others at various locations and pumping fuel from the storage tanks on the two trucks into semi-tractor trailers. They were surveilled making multiple fuel purchases at different pumps at the same gas station at the same time. Torosyan and Eskandari used Chevron fleet fuel cards issued by Synchrony Bank multiple times at a variety of different locations on different days. For example, on June 5, 2014, nine unique Chevron branded fleet gas cards were used to purchase fuel at four different Chevron gas stations for a total fraudulent purchase of approximately $1,113.19.

Surveilling officers observed Torosyan appear to "have issues" with bank cards he was using to make fuel purchases at various locations. For example, on June 19, 2014, Jogodka surveilled Torosyan driving the Ford truck arrive at a Chevron station on West Charleston. He was observed swiping cards multiple times and it appeared that the transactions were not approved. Torosyan left the gas station and drove back to his residence at Lemon Valley Avenue. He was then surveilled leaving the residence and traveling to another gas station where he continued to have issues with the cards he was using to make fuel purchases. This led Jogodka to believe that Torosyan was returning to the residence to obtain more credit/debit cards from his residence when the ones he had been using did not complete the earlier attempted transactions.

The affidavit related that Jogodka and other LVMPD detectives continued surveillance up through the date the warrant was applied for and made similar observations. Based on these observations and the results of the 4-month investigation, Jogodka told the issuing judge that the two vehicles were equipped with custom made fuel tanks that could hold up to 400 gallons of fuel in the rear bed hidden under the trucks' covers. Based on his prior experience with these types of investigations, he related that suspects acquire credit/debit cards by various means and then manufacture fraudulent credit cards to make fuel and other retail purchases.

Jogodka related, based on his training and experience, that individuals engaged in this type of crime use specific equipment to manufacture fraudulent debit and credit cards. He related that a typical process in which bank account numbers are acquired is by the installation of a magnetic card scanning device or "skimmer." A "skimmer" is manufactured utilizing various items that can be purchased over the internet and in some specialty electronic stores. He related how the

1    skimming devices are used to collect account information and how a secondary device is also

2    attached to the fuel pump keypad to capture customers' 5-digit zip code, or 4-digit personal

3    identification number.

4         The affidavit explained how after suspects collect the skimming device installed at gas

5    pumps, they connect it to a computer with specific software installed used to download the data

6    collected on the skimming device.  He related that once the account numbers were downloaded

7    and joined with the associated PIN or zip code, the suspects could then use a reader/writer device

8    to manufacture forged cards.  He explained how connecting to a computer using specific software

9    a reader/writer could reprogram a PVC plastic card with a magnetic strip with stolen account

10   information acquired from a skimming device.  He explained how the process to manufacture a

11   forged credit card or debit card could be done in a short period of time and in a variety of locations

12   to include the inside of a vehicle.  He stated that forged or "cloned" bank cards could then be used

13   to make retail, food, or fuel purchases at the suspects' leisure.  He also explained how this

14   equipment could be stored in a small laptop bag and easily transported, and that forged credit/debit

15   cards could easily be concealed in a variety of ways to avoid law enforcement detection.

16        Based on the facts and observations learned during the investigation, Jogodka asked for a

17   search and seizure warrant for the two trucks and the Lemon Valley residence.  He summarized

18   how both vehicles had been involved and used by Torosyan and Eskandari to purchase diesel fuel

19   using forged credit or credit card numbers that were obtained by fraudulent means.  He also related

20   that while under surveillance, Torosyan and Eskandari were observed constantly talking on cellular

21   phones prior, during, and after the fraudulent activities.  He related that he believed they were

22   communicating with unidentified individuals involved in these criminal activities and that

23   information contained in their cellular phones, like text messages and photos, would assist in the

24   investigation.

25        Finally, the affidavit related that Torosyan had been observed leaving the Lemon Valley

26   residence, making fuel purchases utilizing fraudulent credit cards, and having difficulty on

27   multiple occasions with some of the bank cards.  After having difficulty with the cards, he returned

28   back to the Lemon Valley residence for a short period of time, and then returned to various gas

stations to make additional fraudulent fuel purchases. The affidavit stated that the only residence associated with Torosyan in Las Vegas was the Lemon Valley residence which led Jogodka to believe that Torosyan was manufacturing or storing fraudulent bank cards inside the residence.

The affidavit requested judicial authorization to search for and seize:

1.  Credit cards, debit cards, gift cards, checks, check stock, and card accounts;

2.  Financial statements, receipts, banking statements, warranties, account numbers and profiles;

3.  Digital and/or electronic equipment to include computers, cell phones, digital cameras, etc., specialized equipment used to capture data from magnetic strips of credit, debit, or gift cards, and special equipment used to make credit, debit, or gift cards, checks and identification such as embossers, thermal dye printers and encoders;

4.  Blank white plastic, used credit cards, debit card, gift cards, identification cards, and stored value cards;

5.  Serial numbers and other unique identifiers for new or like-new items that could be matched to sales receipts from fraudulently committed purchases with credit, debit, checks or gift cards;

6.  U.S. currency, foreign currency, and/or other negotiable items that can be determined to have been obtained fraudulently;

7.  Cellular phones;

8.  Fuel storage containers, fixed or free standing;

9.  Automotive fuel, diesel, gasoline or biodiesel;

10. Any vehicles, cars, trucks or trailers equipped with after-market containers used to store and transport fuel; and

11. Articles of personal property to establish the identity of persons in control of the premises.

The search warrant was executed on July 1, 2014. The search warrant return indicates numerous items were seized from the Lemon Valley residence and the Ford truck. It appears that

1    the Dodge Ram was not located on the premises at the time the warrant was executed.  An officer's

2    report dated August 12, 2014, provides a synopsis of the investigation, and lists the items

3    recovered, and the locations where they were recovered from all four search warrants. See Exhibit

4    B to the Motion to Suppress.   Items recovered from the residence include numerous computers

5    and peripheral equipment, various types of electronic storage devices, in excess of 100 credit

6    cards/magnetic skip cards, five or 6 gas pump skimmers and a laptop computer connected to a

7    "fraud lab," cell phones, and a Glock .27 with an obliterated serial number.  Items of evidentiary

8    value were recovered in a hidden compartment under the center arm rest of the Ford F350,

9    including gift cards encoded with forged/fraudulent account numbers.  Eighty-five percent of the

10   forged gift cards were Chevron fleet fuel cards issued by Synchrony Bank. *Id.*

11        Reviewing the affidavit as a whole, the court finds the issuing judge had a substantial basis

12   for concluding that there was probable cause to believe that evidence of the offenses under

13   investigation would be found in the residence and two vehicles.  The Ninth Circuit has directed

14   lower courts not to "flyspeck" the affidavit supporting a search warrant by conducting a de novo

15   review.  Rather the reviewing court must give the issuing judges' determination great deference,

16   and in doubtful cases to give preference to the validity of the warrant.  *See Kelley*, 482 F.3d at

17   1050–51 (citing *Gates*, 462 U.S. at 237 n.10).  Torosyan's motion does not claim that the officers

18   seized items outside the scope of the warrant.  Instead, he argues that the warrant was overbroad

19   in that it was not limited to the items for which the four corners of the search warrant supported a

20   finding of probable cause.  The search warrant is quite broad.  However, the nature of the

21   investigation reveals a broad range of activities in which officers had probable cause to believe

22   Torosyan and Eskandari were engaged over a 4-month period.  The warrant's description of

23   generic categories of items was reasonably specific given the nature of the investigation, and the

24   manner in which the crimes were committed based on Detective Jogodka's training and experience

25   in these types of investigations. Moreover, requests 5 & 6 were specifically limited to "items…that

26   can be matched to sales receipts from fraudulently committed purchases with credit, debit, checks

27   or gift cards" and "negotiable items that can be determined to have been obtained fraudulently."

28

## 2.  The DNA Warrant

Detective Jogodka applied for a state search warrant to obtain Torosyan's DNA on July 1, 2014, the day the search warrant for the residence and the two trucks was executed.  The affidavit supporting the search warrant represented that there was probable cause to believe that his DNA would either include or eliminate Torosyan's involvement in the criminal offenses of possession of a firearm with an obliterated serial number, and possession of scanning devices, citing the relevant provisions of the Nevada Revised Statutes.  The affidavit related that Detective Jogodka had obtained a June 25, 2014 search warrant for the residence and trucks; that the search warrant was executed July 1, 2014; and that Torosyan was one of the occupants of the residence during the execution.  The affidavit outlined the results of the search including the seizure of a Glock 27 40 caliber handgun which had an obliterated serial number, multiple electronic devices identified as bank cark skimming devices for gas pumps and multiple key log or memory devices used to intercept and capture banking and credit card information.

The affidavit related that after receiving *Miranda* rights, which were translated in Armenian, Virab gave statements admitting that the firearm was his, that he knew having the unregistered firearm was not legal, and that it was missing a serial number because the gun was "not good."  Detective Jogodka explained that he and other detectives from other jurisdictions had recovered numerous gas pump skimming devices installed inside gas pumps at gas stations across the country and was aware that the suspects who were installing these devices traveled to other states in attempt to mask their detection by law enforcement.  DNA samples had been recovered from skimming devices and samples were entered into the Combined DNA Index System ("CODIS"), a national database that maintains DNA profiles contributed by federal, state, and local participating forensic laboratories.  He therefore requested authorization to obtain Virab's DNA sample by taking a buccal swab from Torosyan's mouth to compare his sample to the evidence recovered in the July 1, 2014 search warrant, and to add Torosyan's DNA sample into CODIS to identify other cases in which he may be connected.

Torosyan argues that this warrant was invalid because it was based on tainted evidence recovered from execution of the first search warrant.  As the court has found the first warrant was

valid, this argument fails. The search warrant to obtain Torosyan's DNA stated ample probable cause for collecting Torosyan's DNA sample via a buccal swab from his mouth.

### 3. The Camry Warrant

Detective Jogodka applied for and obtained a warrant to search a 2009 white Toyota Camry with California license plates on July 2, 2014. Torosyan argues that this warrant is invalid because Detective Jogodka made material omissions in the warrant affidavit for the Camry, and because the warrant was overbroad. Torosyan claims that Detective Jogodka made material omissions in the search warrant by failing to inform the issuing judge of the source of the information that the Camry had a hidden compartment. The Toyota had been searched in California the day before pursuant to a warrant issued there, and no evidence was recovered. Torosyan has learned through discovery produced by the government in this case that the information that the Camry had a hidden compartment in which evidence could be recovered came from Eskandari. He argues Detective Jogodka knew Eskandari was not a reliable source of information because he was a target in the investigation, had a criminal history including fraud, and had a motive to fabricate information to put the blame on others once he got caught. Detective Jogodka failed to provide critical information bearing on the informant's reliability to the issuing judge. Given Eskandari's involvement in the investigation, criminal history, and motive to fabricate, this would undoubtedly have made the judge more skeptical and question whether probable cause existed.

Torosyan therefore requested a *Franks* hearing arguing he had made a sufficient showing that Detective Jogodka made deliberate or reckless misstatements or omissions in the affidavit supporting the warrant, and that the warrant redacted or supplemented would not support a probable cause determination. Torosyan points out that there is no good faith exception to a *Franks* violation. A warrant based upon knowing or recklessly made falsehoods in the supporting affidavit is invalid. Torosyan also argues that the warrant for the Camry was overbroad and tainted because it was based on information learned during execution of the first warrant for the Lemon Valley residence and trucks.

The affidavit supporting the warrant sought to search for and seize the same items requested in the search warrant for the Lemon Valley residence and the two trucks in addition to

the Camry itself to recover evidence of possession of credit card without an owner's consent and fraudulent use of credit card without owner's consent, and theft over $3,500. The affidavit related that on June 25, 2014, Detective Jogodka obtained a search warrant to search the Lemon Valley residence and the Ford truck to recover evidence for the same offenses. The Ford was registered to Laura Balasanyan, Torosyan's wife. The investigation involved the use of fraudulently obtained credit card numbers by means of utilizing a bank card skimming device attached to the internal electronics of the gas pump. It described how the crimes were committed and how suspects like Torosyan would use the forged credit cards to purchase large amounts of diesel fuel and then transport it back to sell at predetermined locations in California and Nevada. It also related that on July 1, 2014, the search warrant was executed, that Torosyan was one of the occupants of the residence, and arrested on multiple felony charges as a result of this investigation. It outlined items of evidentiary value that were recovered from execution of the search warrant.

The affidavit also related that on July 1, 2014, unidentified law enforcement officials "had come into contact with Laura Balasanyan and a 2009 white Toyota with California license plates during the execution of the search warrant." No evidence from the crimes under investigation was found and the vehicle was released. A record check indicated that the registered owner was Gohar Torosyan from Glendale, California. Gohar Torosyan was identified as the daughter of Laura Balasanyan and Virab Torosyan. Detective Jogodka was informed "of information gleaned from" law enforcement officers in California that the Toyota Camry "operated by Laura Balasanyan, who was the wife of Virab Torosyan, also had a hidden compartment inside the vehicle containing multiple forged bank cards."

The affidavit went on to relate that the Camry had been observed at the Torosyan residence on numerous occasions. Detective Jogodka had conducted surveillance on the Camry observing Laura Balasanyan and/or Virab Torosyan operating it. On the night of July 1, 2014, the vehicle was parked in the driveway of the Lemon Valley residence at approximately 11:00 p.m. The following day, Detective Jogodka observed the Camry at the residence at approximately 10:45 a.m. parked in the driveway. Based on evidence obtained from law enforcement officers in California, the evidence recovered during execution of the search warrant at Lemon Valley, and

based on Detective Jogodka's training and experience with the crimes under investigation, he requested permission to search the Camry. The affidavit related that forged plastic bank cards or other items used to manufacture forged bank cards could easily be concealed on a person or within a container to elude law enforcement detection. He requested seizure of all cell phones because Torosyan and his associates had been observed on numerous occasions talking on cell phones while committing the criminal acts mentioned in the affidavit. He represented that data on the phones would assist in identifying who the individuals are communicating with and provide a nexus of their criminal enterprise.

Detective Jogodka's affidavit represented to the issuing judge that information the Camry had a hidden compartment was "gleaned from LEO [law enforcement officers]" that the Camry operated by Laura Balasanyan, Torosyan's wife, "also had a hidden compartment inside the vehicle containing multiple forged bank cards." Torosyan claims that statement is false and misleading because the information actually came from Eskandari during a law enforcement interview on July 1, 2014, after search warrants were executed as part of the California part of this investigation. A Secret Service memorandum of interview is attached as Exhibit J to the motion to suppress. It summarizes an interview conducted July 1, 2014, by Secret Service Special Agent Aboosamara and Sergeant Suttles of the Glendale Police Department. The two officers interviewed Eskandari after his arrest on July 1, 2014, while he was in custody at the Glendale city jail. In the interview Eskandari admitted that he worked for Torosyan and explained his role in the scheme to use cards to purchase diesel fuel which he would load into one of two trucks, a white Dodge, and a blue Ford. Eskandari explained that there were special tanks to hold the diesel fuel located in the back of each pickup truck. He also stated that Torosyan had a Toyota Camry that has a hidden compartment in the middle console. Eskandari described at length his role in the credit card/diesel fuel scheme and identified others who were involved.

Detective Jogodka did not tell the issuing judge that the information that the Toyota Camry had a hidden compartment containing forged cards came from Eskandari. Rather, his search warrant affidavit stated that the information was "gleaned from" law enforcement officers. This statement is literally true. SA Aboosamara gave this information to detective Jogodka. The

20

government's response does not address whether Detective Jogodka was aware that the information he received from fellow law enforcement officers about the Camry having a hidden compartment came from Eskandari.

A defendant is entitled to a hearing pursuant to the Supreme Court's opinion in *Franks v. Delaware* 438 U.S. 154 (1978), where he makes a substantial preliminary showing that: (a) the affidavit in support of a search warrant contains intentionally or recklessly false statements or misleading omissions; and (b) the affidavit in support of a search warrant cannot support a finding of probable cause without the allegedly false information. *Id*. at 170; *United States v. Reeves*, 210 F.3d 1041, 1044 (9th Cir. 2000). To justify a hearing, a defendant must make "specific allegations, allege a deliberate falsehood or reckless disregard for the truth, and accompany such claim with a detailed offer of proof." *United States v. Craighead*, 539 F.3d 1073, 1080 (9th Cir. 2008) (citation omitted). Intentional or reckless omissions may also provide grounds for a *Franks* hearing. *See United States v. Jawara*, 474 F.3d 565, 582 (9th Cir. 2007). If a defendant makes the requisite preliminary showing, the court conducts a hearing to determine the validity of the warrant. Suppression results if, after excising the false or misleading statements from the affidavit, there is not probable cause to support the warrant. *See Franks*, 438 U.S. at 171–72.

The court finds that Torosyan has not met his burden of making a substantial preliminary showing that the affidavit supporting the search warrant for the Camry contained intentionally or recklessly false statements or misleading omissions. Torosyan has also not shown that the affidavit does not support a finding of probable cause without the allegedly false information.

Torosyan's motion claims that Detective Jogodka was aware that the information that the Camry had a hidden compartment came from Eskandari and not law enforcement officials. He bases his argument on the July 1, 2014 memorandum of interview of Eskandari conducted by Special Agent Aboosamara and Sergeant Suttles the government produced in discovery. However, there is no evidence in the record that Detective Jogodka was aware of the underlying source of the information he received from law enforcement officials involved in the California portion of this investigation at the time he applied for the Warrant to search the Camry.

The affidavit supporting the search warrant for the digital devices Detective Jogodka prepared stated that he was contacted by U.S. Secret Service Special Agent Aboosamara in California on July 2, 2014, who "relayed information about a Toyota Camry, operated by Laura Balasanyan, the wife of Virab Torosyan." Motion to Suppress, Exhibit I, ¶11. Detective Jogodka stated that Special Agent Aboosamara told him the Camry "had a hidden compartment inside the vehicle possibly containing multiple forged bank cards." *Id.* Detective Jogodka stated in this affidavit that Special Agent Aboosamara "conducted a parallel investigation on Torosyan and his associates in California, and also served search warrants at multiple locations on July 1, 2014." *Id.*

Assuming, without deciding, that Detective Jogodka was aware that the information came from Eskandari, he should have informed the issuing judge of this fact. However, there is no indication that he intentionally or recklessly failed to inform the court of Eskandari's involvement in the investigation or Eskandari's criminal history.

Torosyan claims that Detective Jogodka knew Eskandari was not a reliable source of information because he was a target of the investigation, had a criminal history, and had motive to fabricate to blame others. Detective Jogodka knew about Eskandari's participation in the scheme under investigation and related Eskandari's role at length in his search warrant application for the Lemon Valley residence and the two trucks. In that affidavit, he disclosed Eskandari's criminal history to the issuing judge. Specifically, he related that a record check of Eskandari's criminal history revealed he had an arrest on February 4, 2014, by Glendale Police Department for the misdemeanor offense of making a false financial statement. Motion to Suppress, Exhibit A, ¶12. Eskandari had also been arrested for criminal charges including possession of a controlled substance, a felony, on August 10, 2008, indecent exposure with prior, and inflicting corporal injury on a spouse/cohabitant on January 25, 2012, "with no status of convictions, out of Burbank, California." *Id.*

Torosyan claims that Detective Jogodka knew Eskandari was not a reliable source of information because he was a target of the investigation, had a criminal history, and had motive to fabricate to blame others. However, Detective Jogodka could easily have provided information

22

supporting the reliability of Eskandari's statements to Special Agent Aboosamara and Sergeant Suttles. Eskandari was intimately involved in the investigation and participated in the criminal conduct. In his interview Eskandari described what he and Torosyan were doing. Detective Jogodka had himself observed what Torosyan and Eskandari were doing over a four-month period that he outlined at length in his application for the first warrant. Eskandari's involvement and incriminating admissions implicating himself made him a percipient witness with unique knowledge of the crimes. Eskandari admitted his own involvement, described his role, and also implicated others, including Torosyan, in the crimes under investigation. His interview with Special Agent Aboosamara and Sergeant Suttles did not merely blame others. Rather, the information Eskandari provided was based on his own personal knowledge, observations, and participation in the scheme under investigation. Detective Jogodka's own investigation and observations during surveillance over a four-month period as outlined at length in his application for the first warrant was consistent with the interview Eskandari gave on July 1, 2014. Thus, Detective Jogodka could easily have supported the reliability of Eskandari's information if he was aware the information that the Camry had a hidden compartment came from Eskandari. The court concludes that any omission that the information came from Eskandari, would not cast doubt on the existence of probable cause because Jogodka could easily have established the reliability of Escandari's information based on Jogodka's own investigation and observations. Moreover, the fact that Detective Jogodka revealed Escandari's involvement in the investigation and criminal history in the application for the first search warrant belies the notion he was intentionally or recklessly attempting to mislead the judge to whom the application for the Camry warrant was submitted.

### 4. The Warrant for Electronically Stored Information

Detective Jogodka applied for a search warrant to search digitally stored records and devices on July 30, 2014. These were the electronic storage devices and computers seized from execution of the first search warrant at the Lemon Valley residence, trucks, and the Toyota Camry. He sought judicial authorization to search the internal bank skimming devices for gas pumps, internal bank cark skimmers, various electronic storage devices including cell phones, and key

1    loggers.  The affidavit related that he believed that the digital storage devices that were impounded

2    during execution of the search warrants contained evidence of Torosyan's involvement in the

3    planning or commission of the crimes of possession of scanning device, possession of a financial

4    forgery laboratory, possession of credit/debit cards without owner's consent, fraudulent use of

5    credit/debit cards without owner's consent, and theft between the dates of December 1, 2013, and

6    July 1, 2014.  The affidavit related that he believed these digitally stored records of user and/or

7    device-created data would tend to establish the identity of persons who were in sole or joint control

8    of the digital storage devices themselves.

9    　　　　He supported his application by relating the history of the warrants obtained on July 1,

10    2014 for the Lemon Valley residence and trucks, and the July 2, 2014 warrant for the Toyota

11    Camry which recovered the items he was now seeking to search.  The two warrants were

12    incorporated by reference as though fully set forth.  Search Warrant for Electronic Storage Device,

13    Jogodka Declaration, Exhibit I to the Motion to Suppress, p. 4.  The search warrant application

14    related that the storage devices were in the custody of the Las Vegas Metropolitan Police

15    Department vault and provided its location.  It described the items that were recovered on July 1

16    and 2, 2014.  It described how the various devices that had been seized for which a search warrant

17    was requested could contain evidence of the crimes under investigation.  It described how portable

18    digital memory devices can store a variety of digital information over a long period of time.  It

19    related that suspects are "known to hold onto the acquired credit and debit card numbers for a

20    period of time.  This is done to conceal the identity of the compromised location to minimize the

21    availability of video surveillance to Law Enforcement officials."  *Id.* ¶7.  It explained how the

22    search might uncover evidence to identify co-conspirators and provide additional evidence to

23    support the criminal acts under investigation.

24    　　　　The affidavit related that as a result of the investigation Detective Jogodka believed there

25    would be digital evidence contained in the memory of the items seized.  He also requested judicial

26    authorization to search the cellular telephones to allow detectives to determine who Torosyan

27    might be working with, to what extent, and what other telephone numbers Torosyan or his co-

28    conspirators may have been using to communicate with each other.  It related that Torosyan

constantly traveled to California, Utah, and other states, and was known to work with other unidentified suspects whose identities might be revealed from searching the cell phones. It related that a search of the skimming devices would reveal additional account numbers belonging to unidentified victims and reveal locations of where skimming devices were installed.

The search warrant requested authority to duplicate the electronic media by a forensic technician to determine if evidence of the offenses enumerated in the application were contained on the devices. It indicated a master copy would be retained in evidence storage for later discovery and trial purposes. It requested authority to detect and circumvent passwords, encryption, and other investigational hindrances. It also specifically requested offsite search authorization because "the execution of this warrant may take a great deal of time and require a secure facility, special equipment." *Id.* p.10-11. Specifically, because it was unknown what operating system was running on the computers, it would take time to determine how the operating system permits access to data; the amount of data that may be stored on the devices is enormous, and the number or size of the hard drives and removal of storage devices needed to be searched was not known; the devices may contain hidden files, program files and "deleted" files that have not been overwritten; the data may be encrypted or inaccessible without a password and may be protected by a self-destructing program which would take time to bypass; because data stored on a computer could be destroyed or altered rather easily, intentionally, or accidentally, the search must be conducted carefully and in a secure environment; and the need to clone, *i.e.* make master copies of the data, to prevent alteration of data and ensure the integrity of the search which would take time and special equipment.

The affidavit specifically requested permission to allow the evidence to be sent to a law enforcement forensic laboratory outside of the District of Nevada "due to the limited resources available in Clark County, Nevada, to accomplish the tasks requested within a timely manner." *Id.* p.10, ¶17.

Torosyan claims there was an unreasonable delay between the seizure of the electronic storage devices and obtaining a warrant to search their contents which violated his Fourth Amendment rights. The Supreme Court has often said that the touchstone of the Fourth

Amendment is reasonableness.  The Fourth Amendment protects two different interests—"the interest in retaining possession of property and the interest in maintaining personal property." *Texas v. Brown*, 460 U.S. 730, 747-48 (1983), (Stevens, J., concurring), cited in *Arizona v. Hicks*, 480 U.S. 321, 328; *See* generally *United States v. Jones*, __ U.S. __ 132 S. Ct. 945, 951 (2012); *Soldal v. Cook County*, 506 U.S. 56 (1992).  The Supreme Court has adopted a balancing test to determine whether a seizure is reasonable.  It balances "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion."  *United States v. Place*, 462 U.S. 696, 703 (1983).  The Ninth Circuit determines whether a delay in obtaining a search warrant was reasonable under the totality of the circumstances and "not whether the Government pursued the least intrusive course of action."  *United States v. Sullivan*, 797 F.3d 623, 633 (9th Cir. 2015), citing *United States v. Hernandez*, 313 F.3d 1206, 1213 (9th Cir. 2002) (internal citations omitted).  This determination is made on a case-by-case basis.  *Id.*, citing *United States v. Van Leeuwen*, 397 U.S. 249, 253 (1970).

In *Sullivan*, the Ninth Circuit applied the Supreme Court's balancing test to the seizure of Sullivan's laptop.  It began by considering the extent of the intrusion on Sullivan's possessory interests under the totality of the circumstances.  It also outlined a number of factors the court should consider in evaluating the extent of the intrusion, and balancing the government's interests.  Sullivan was on parole for sex related conduct involving a minor.  He was subject to a range of standard and special parole conditions including a consent to search which he acknowledged by signing the notice form and initialing each special condition.  Police received information from the mother of a 14-year-old girl that Sullivan had kidnapped, raped, and pimped her daughter.  Based on this report, Sullivan's parole was revoked.  During a parole search of his car, agents seized several items, including a laptop computer, digital camera,  a book about pimping and a cellular telephone.  These items were transferred to the custody of the Berkley Police Department because the California Department of Corrections did not have the technical ability to conduct a forensic search of the laptop.  Approximately three weeks later, Berkley Police Department detectives interviewed Sullivan at the jail.  Sullivan claimed that one of the videos on his laptop

would show that the female victim appeared to be eighteen years of age or older. He asked that the detectives look at the video to corroborate his belief. Five days later, the detectives obtained a search warrant to search the laptop.

Sullivan was subsequently indicted on federal charges and moved to suppress evidence obtained from the laptop computer. He argued that the 21-day delay between the date the parole officers seized the laptop and the date the police obtained a warrant was unreasonable under the Fourth Amendment. The Ninth Circuit determined that the seizure was reasonable. First, the court concluded that the extent of the intrusion on Sullivan's possessory interests was minimal because during the entire period of time the laptop was retained by the government, Sullivan was in custody. 797 F.3d at 633. Sullivan did not claim that he could have made use of the laptop while incarcerated, or that he sought return of the laptop to himself or to a third party. *Id.* Citing *Segura v. United States*, 468 U.S. 796, 813 (1984), the Ninth Circuit noted that "[w]here individuals are incarcerated and cannot make use of seized property, their possessory interests in that property is reduced." *Id.* Additionally, citing *United States v. Johns*, 469 U.S. 478, 487 (1985), the Ninth Circuit noted that an individual who did not even allege, much less prove, that the delay in the search adversely affected legitimate interests protected by the Fourth Amendment and never sought return of the property has not made a sufficient showing that the delay was unreasonable. *Id.* at 633-34 (internal quotations omitted).

Next, the Ninth Circuit considered the degree to which the seizure and retention of the laptop was necessary for promotion of legitimate government interests. *Id.* at 634. The court found that the state had an overwhelming interest in supervising parolees, and that the government had a reasonable basis for retaining and searching the laptop based on the likelihood that it contained evidence of Sullivan's parole violations as well as child pornography. *Id.* Additionally, because the parole officers who initially seized the laptop did not have the ability to perform a forensic review, they transferred it to the local police department for this purpose. *Id.* Under these circumstances, the court found "[t]he government's course of conduct was reasonable, under the totality of the circumstances given Sullivan's incarceration and the government's interests in retaining and searching the laptop for evidence of crimes." *Id.* The court also found that even if

the government "could have moved faster to obtain a search warrant, the government is not required to pursue 'the least intrusive course of action.'" *Id.*, citing *Hernandez*, 313 F.3d at 1213. The Ninth Circuit therefore concluded that the government seizure and retention of the laptop before obtaining a search warrant was not an unreasonable seizure under the Fourth Amendment.

Here, Torosyan was arrested on multiple state charges on July 1, 2014 after the first search warrant was executed at his residence. The court has no information about how long he remained in state custody following his arrest. He was arrested on February 3, 2016 in the Central District of California on a warrant issued after the indictment was returned in this federal case and remanded to custody and held to answer in this district. See, Rule 5(c) documents ECF No 4.  He has been detained in this case since he made his initial appearance on February 12, 2016.  There is no suggestion that Torosyan ever requested a return of any of the items seized in execution of any of the four search warrants at issue in this case.  This motion to suppress was filed in April 2017, nearly three years after the seizures at issue.  Like the defendant in *United States v. Johns*, 469 U.S. 478, 887, Torosyan has "not even alleged, much less proved, that the delay in the search . . . adversely affected legitimate interests protected by the Fourth Amendment."  Thus, Torosyan has not shown that the government meaningfully interfered with his possessory interests in the seized property.

Turning to the degree to which the seizure and retention of the evidence was necessary for the promotion of legitimate governmental interests, the court finds the government has a legitimate interest in retaining the property to further the investigation in this case.  The government's course of conduct was reasonable under the totality of the circumstances given the length of the investigation, the complexity of the fraudulent scheme under investigation, the need to search electronic storage devices, the need to send them out of state for forensic review, and the specialized expertise and equipment needed to complete the search.  The affidavit supporting the application explained at length the forensic challenges involved in searching electronic storage devices, and the fact that it might take considerable time and needed to be conducted in a controlled environment by forensic specialists.  Detective Jogodka specifically requested, and received, judicial authorization to send the evidence out of the jurisdiction because the local laboratory did

1    not have the forensic capability to conduct the search.  Under these circumstances, the court finds

2    that Torosyan's Fourth Amendment rights were not violated.

3          For the reasons explained,

4          **IT IS RECOMMENDED** that:

5          1.   Torosyan's Motion to Suppress Statements (ECF No. 60) be **DENIED** as moot given

6                the government's representations that it would not seek to introduce his statement in its

7                case in chief; and that the government be precluded from introducing his statements

8                during its case-in-chief, reserving until the time of trial whether Torosyan's statements

9                were voluntary in the event Torosyan elects to testify and his testimony is inconsistent

10               with his prior statements to the police.

11         2.   Torosyan Motion to Suppress (ECF No. 60) be **DENIED** in all other respects.

12         DATED this 28th day of July, 2017.

13

14                                                    _____
                                                      PEGGY A. LEEN
15                                                    UNITED STATES MAGISTRATE JUDGE

16

17

18

19

20

21

22

23

24

25

26

27

28